89 So.2d 413 (1956)
Kate Evans JOHNSON
v.
Emmitt WHITFIELD.
No. 4250.
Court of Appeal of Louisiana, First Circuit.
June 29, 1956.
Rehearing Denied September 24, 1956.
Barnes & Smith, Baton Rouge, for appellant.
Ralph L. Roy, Baton Rouge, for appellee.
ELLIS, Judge.
Plaintiff was a guest passenger in a car owned and being operated by Morris Sholes which, at about 2:30 A.M. on the 7th day of March, 1954, collided with a car owned and being driven by the defendant Whitfield. From an adverse judgment she has appealed to this Court.
Sholes had taken the plaintiff from Baton Rouge to visit her children in New Orleans, and they were accompanied by Hannah Lee Minor, plaintiff's cousin, who had been returned to her home in Baton Rouge prior to the accident. Sholes and the plaintiff then decided that they were hungry and would return to Scotland, which is in North Baton Rouge and while driving south on Scenic Highway the collision occurred.
*414 Plaintiff and Sholes testified that the defendant, without lights, backed his automobile from the vicinity of a filling station opposite Oriole Street across Scenic Highway when the Sholes car was too near to avoid the collision, although Sholes' horn was blown and brakes applied.
The defendant and his alleged eyewitness, Thomas, stated that the defendant was backing out of Goose Street which has been estimated to be from 150 to 250 feet North of Oriole Street, and that he backed across Scenic Highway and had completed his turn to the south and was in second gear traveling at about 20 miles an hour when the car driven by Sholes, traveling at a speed estimated by the witness Thomas to be 65 to 70 miles per hour, struck the rear end of defendant's automobile.
The question to be decided is one of fact, which we realize was resolved in favor of the defendant by the learned judge of the District Court, however, his reasons were given orally and were not transcribed and placed in the record. In such cases we have only the record to consider and should not surmise, unless it is shown by the record, that a witness or witnesses were not worthy of belief or that possibly their demeanor on the stand was such that the Lower Court did not believe them. In the absence of any reasons in the record that the manner or demeanor of any witness testifying in the case was unsatisfactory to the trial judge or that the witnesses falsified, we can only assume that the Lower Court decided the case strictly upon the actual testimony and when the plaintiff's case has been dismissed, that the Lower Court believed that the plaintiff had not proved his case as required by law.
The plaintiff testified that she had gotten Morris Sholes to take her to New Orleans to see about her children, and after returning to Baton Rouge and leaving her cousin Hannah Lee Minor, at the latter's home, Sholes persuaded her to go with him to get something to eat. They then started back to Scotland and were traveling south on the Scenic Highway at a speed of approximately 45 or 50 miles per hour when she saw the Whitfield car crossways of the Highway across the black line, with no lights. She estimated the distance when she first saw the Whitfield car across the highway as being the length of the room, which counsel for plaintiff estimated and placed in the record as being a distance of approximately 50 feet. She screamed and said: "Look out! We are going to have a wreck", and the collision occurred.
She said that Sholes got out of the car, crossed and asked the defendant Whitfield: "Why did you back out in front of me," and Whitfield answered, "I thought I could make it." Within about three minutes after the collision, Oree Evans, another cousin of the plaintiff, came to the scene of the wreck, and after the police were called, they got Howard Thomas, who lived very close on Scenic Highway to take the plaintiff to the hospital. She wore glasses which had been broken and her face had broken the windshield of the car, cutting her face in many places which required 35 stitches.
After the plaintiff returned home from the hospital she stated that the defendant came to her home to see how she felt and told her that she did not have anything to worry about, he had insurance on his car but at the time she asked him, "Why did he back out in front of us and he say, well, I thought I could make it, and I say you know good and well you couldn't make it as close as we was on you."
Sholes testified that he was traveling on Scenic Highway south at approximately 1:30 or 2:00 o'clock in the morning at the rate of about 45 miles per hour when he noticed a car in front of him without any lights backing across the street between Kitty and Goose Street, "which would be directly in front of Oriole." His first idea was to try to miss the car and he thinks he would have done so if the defendant's car had stopped where it was, but instead he tried to "pull off and at that time that when the accident happened." *415 He further testified that he blew his horn and applied his brakes in order to warn Whitfield and in an attempt to avoid the accident and that after the collision the horn was stuck and it was necessary for him to cut the wires to stop it from blowing. Sholes questioned Whitfield immediately after the accident and the latter told him that "he thought he could make it out of the road before the car got there," although he stated he saw the car coming. Sholes also stated that from the point from which Whitfield backed out to the point of impact "wasn't over fifteen or twenty feet I know." Both he and the plaintiff as well as Hannah Minor testified that they had had nothing to drink on the trip. In describing the place that Whitfield backed from left to right across Scenic Highway, Sholes testified that directly in front of Oriole Street was a two-story building that had been used as a garage for trucks, and that Whitfield backed out from a station, presumably a filling station, in connection with this garage across Scenic Highway directly in front of Oriole Street.
A Highway Patrolman was called to the scene of the accident and testified, which is corroborated by the map and report of the accident, that it happened almost opposite Oriole Street. This testimony would also be corroborative of Sholes' testimony. According to the report, the vehicles traveled approximately 12 feet after the collision and Sholes' automobile came to rest pointing in a northwesterly direction on the west side of Scenic Highway just to the south of and opposite Oriole Street, while the defendant Whitfield's car came to rest close to the entrance of Oriole Street, pointed in an easterly direction. According to this patrolman's testimony, none of the parties involved in this wreck were drunk nor could he detect any signs of drinking and he stated that Sholes told him that he was traveling 50 miles per hour and that he was only 25 feet away when he first saw Whitfield's car, and that Whitfield did not mention backing out of Goose Street but merely stated that he backed across Scenic Highway. He stated that Goose Street was never mentioned to him. This officer stated that Whitfield further told him that he had backed across the highway and had gotten straightened out and was traveling at approximately 20 miles per hour in the west or southbound traffic lane, which is the lane in which the collision occurred, when he was struck from the rear by the Sholes car. The officer stated that the left front fender and body of the Sholes car was damaged, and the right rear portion of the Whitfield car.
Oree Evans testified that she and a man named McKee were standing outside the "Paradise Inn", which is located on Scenic Highway about 3 blocks from the scene of the accident when the Sholes car passed going approximately 45 or 50 miles per hour, and very shortly thereafter she heard the horn blowing and brakes and that she and her companion got in a car and drove to the scene of the accident and were the first to arrive; that she recognized her cousin, the plaintiff, as being in the car. She testified positively that she never got in the car but that soon afterward she assisted plaintiff out of the car and into Howard Thomas' car and that she accompanied her to the hospital.
The only testimony offered on behalf of the defendant other than himself was that of Howard Thomas, who stated that he had known both the plaintiff and the defendant for approximately ten years, that he lived at 8966 South Scenic, Scotland, which is on the west side of the highway, and there is only one house between his and Oriole Street which intersects Scenic Highway from the east. He stated that he was sitting in his car parked in front of his house facing north the night of the accident, and when asked what time, he stated: "I don't exactly remember the time. I mean, it must have been around nine or ten o'clock, something like that at night, late in the night." Of course, this accident is definitely proven to have occurred between two and two thirty in the *416 morning. He said that he had been to the ice cream parlor and gotten some ice cream "and had came back and was sitting in my car in front of the house" and he was looking north and saw Emmitt Whitfield, the defendant, backing out of Goose Street across Scenic Highway. When asked how far Goose Street was from where he lived he testified: "I guess about one hundred seventy-five or one hundredtwo hundred feet from me." He saw the defendant's car backing out from Goose Street across Scenic Highway with all its lights burning, and stated that he noticed the tail light was also burning. At this point it might be well to state that a rough diagram showing the intersection of Goose Street with Scenic Highway shows that Goose Street runs in a northwesterly direction from Scenic Highway, which, of course, would make it more favorable for this witness, if he was looking, to see the tail lights if they were burning on defendant's car, than for Morris Sholes to see them if they were burning and if he backed out of Goose Street, which is not proven by the record. At the time that the defendant backed into Scenic Highway, Thomas stated that he did not see another car coming but that when the defendant was "about second gear and when this other car came down the road approaching it at a speed, I guess, well, around 65 or 70 miles an hour and ran directly into the back of Emmitt's car, but I didn't know whose car it was at that time, and I jumped out of my car and ran to the scene." He further testified that Whitfield traveled down Scenic Highway a distance of "must have been seventy-five feet, I imagine," before he was struck by the Sholes car. Immediately after testifying that Whitfield had backed out of Goose Street, which he estimated to be from 175 to 200 feet from Oriole Street, and that the Sholes car struck the defendant's car 75 feet from Oriole Street, he then testified, when asked how far the accident happened from Oriole Street, that is, from where it intersects Scenic Highway, that "it happened, well, right in the intersection of Oriole Street is where it happened at, right at the intersection there." This testimony cannot be reconciled, for if Goose Street is 175 feet from Oriole Street, and the accident happened 75 feet away from Goose Street it would have occurred, according to this witness' testimony, approximately 100 feet from the intersection of Oriole and Scenic Highway, and there is no contention that these cars traveled any appreciable distance after the collision. In fact, the police officer fixed the distance as 12 feet that the cars traveled, approximately, after the collision, and Sholes testified that they traveled not over 15 or 20 feet. This is undisputed.
This witness, Thomas, further testified that "I didn't hear no sound of any brakes at all" and neither did he hear any horn blowing. This is in the face of the testimony of Sholes that he applied brakes and that he had to cut the wires of the horn in order to stop it from blowing, and is also contrary to the positive testimony of Oree Evans who was approximately 3 blocks away, that she heard the horn blowing and the noise made by the brakes and proceeded to the scene of the accident and was the first one there. She did not see Howard Thomas until she went in front of his house with the plaintiff to get in his car to be taken to the hospital and she stated that she saw him coming out of his yard. This witness stated that she was practically at the scene of the collision when it occurred and that he went immediately to the scene, and yet Oree Evans, three blocks distance was the first one to the scene and this testimony is undisputed and Thomas testified that when he got to the car Oree Evans was sitting in the car with the plaintiff. Oree Evans denied positively that she ever got in the car with the plaintiff and offers as her reason that the plaintiff was bleeding profusely and, furthermore, unless she got in under the steering wheel she could not have done so as plaintiff was occupying the right-hand side of the front seat in Sholes' car. Thomas *417 further testified that when he got there Sholes was cursing, and in describing his condition he stated: "Yes, sir, well, he had been drinking and he was using vigorous language. I smelled the alcohol on him," and he stated as another reason why he thought Sholes had been drinking that, "He was talking crazy talk." He stated Sholes said "He didn't give a damn what happened. He said he had insurance on his car and he didn't know whether Emmitt had insurance or not, but he didn't give a damn, he could get another car any time he got ready to. Then I left and I mean this girl here was suffering so I taken her to the hospital and when I came back the law was there." When asked about the position of the automobiles after the wreck this witness stated: "Emmitt's car, it knocked it over to the right of the Scenic Highway over by a filling station over there and it knocked Emmitt in the back seat. He was in the back seat of the car." This testimony to the effect that the defendant's car was knocked across Scenic Highway "over by a filling station over there" is corroborative of the testimony of Morris Sholes that the defendant backed from this filling station across Scenic Highway, rather than from Goose Street which is a block to the north, estimated from 150 to 250 feet in the testimony. Thomas further stated in his testimony that when he first saw the Sholes car the defendant had backed out of Goose Street and was coming south and that the Sholes car was about two blocks away at that time. This testimony is almost impossible. This witness' testimony is shown to be unreliable to such an extent by the positive testimony of some of the other witnesses that on the face of the record it cannot be accepted as being true on the material points necessary and so much doubt is cast upon it that one seriously doubts that he was sitting in front of his house in his car eating ice cream at two or two thirty in the morning as he states. In other words, there is a serious doubt that he was an eyewitness at all. (Emphasis added.)
The testimony of the defendant is to the effect that he operated a bar in partnership with his sister in Scotland named the "Willow Inn" and that their joint income was approximately $5,000 per year; that he owned a ½ interest in the building and land but owned no other property of any kind. He states he was going to see a girl friend and had gone off Scenic Highway into Goose Street with the intention of going south to Kitty Street which also intersects Scenic Highway on the west side south of the intersection or Oriole on the east. He stated that the street was so bad that he decided to back out and before he backed he looked and saw Sholes' car about a quarter of a mile away and decided he had time to make it and backed on out, apparently did not look any more, and states that he had gone forward and gotten into second gear and was in the west or southbound traffic lane on the right side of Scenic Highway traveling about 20 miles an hour and that when he had gotten approximately 100 feet south of Goose Street the accident happened. The testimony shows that the night was clear and this witness testified that he had all his lights on. He denied that he told Sholes at the scene of the accident that he had seen him coming but thought he could make it but he did admit that "I mentioned it to several of my other friends. The other fellow what drove up there, let me see what his name, is, Kees, I mentioned it to him." The defendant testified that Kees was the first man up there when the accident happened. While he calls him Kees, other testimony identifies this witness as McKee, the man who drove Oree Evans to the scene of the accident. The defendant's statement that Kees was the first man to the accident is rather hard on the testimony of Howard Thomas who stated that he was right at the scene and immediately ran there, and yet he was preceded to the scene by a man and woman who were three blocks away. The defendant also stated that Kees told him that when the Sholes car passed him that he said "Go *418 ahead, somebody will stop you down the road and sure enough that he done run into me." Defendant testified that Kees saw the accident, yet it is passing strange that Kees or McKee was not a witness nor any explanation given for his absence.
Defendant admits that the cars came to rest as previously described close to the intersection of Oriole with Scenic Highway and right across from the garage or filling station that Sholes testified the defendant backed out from. It is impossible to reconcile the distances or estimates of distances given in this case as to the point of impact and the distance traveled by the cars after the accident with the testimony of the defendant and Thomas that the former backed out of Goose Street rather than from the garage or filling station directly in front of Oriole. This fact is immaterial other than that it completely discredits the testimony of the defendant and his witness, Thomas. There is only the testimony of Thomas that Sholes was exceeding the speed limit and this was an estimate made while he was allegedly eating ice cream at two thirty in the morning in front of his home. The damage to the automobiles is shown to be approximately $250 and $300, respectively, which certainly does not indicate a colliding speed of 60 or 70 miles an hour, and the estimated distance of 12 to 20 feet which the cars traveled after the impact is most destructive of Thomas' estimate of the speed of the Sholes automobile.
From this record we find the speed of the Sholes automobile within the limit and to be approximately 45 or 50 miles per hour, and it is apparent that if the defendant had not grossly overestimated the distance of the Sholes automobile at the time he started his backing maneuver, he would never have been struck, and the testimony is most convincing that he never looked again after first observing the Sholes automobile coming down Scenic Highway. It was clearly his duty to look before his car backed into Scenic Highway, and had he done so, whether he backed out from Goose Street or from the garage, he would have seen Sholes' car much too close for him to have assumed that he could have reasonably backed out without causing a collision. He was negligent in not keeping a proper lookout and in not seeing what he should have seen and was entirely responsible for creating an emergency as Sholes was traveling at a legal rate of speed. Considering all the testimony, we do not believe that defendant had his lights on and, further, that he had not backed from Goose Street but from this filling station or garage. Sholes did all that he could to avoid the collision as soon as he was able to see defendant's automobile backed across the highway, and he is free of negligence.
There is one other fact that should be mentioned. It is shown by the record that the plaintiff had received $1,000 settlement from the insurer of the Sholes automobile, and it might be argued that this was an admission of negligence although we are not favored with a brief by counsel for defendant and possibly he has withdrawn from the case. As to whether the insurance company considered Sholes negligent or not is beside the point. This record does not convict him of any negligence. Furthermore, counsel for defendant attempted to impeach the testimony of the plaintiff by asking her if she had not given a statement to an adjuster for the insurer of Sholes' car to the effect that the latter was being driven at 70 miles per hour at the time of the collision. A subpoena duces tecum was issued by the court and from the record it appears that the statement was in the office of the insurance company in Baton Rouge, and ample time was shown to have been given for the securing of this statement, and yet there is no further explanation of the failure to secure it and produce it in the record if it existed, and with the present state of the record we must presume it did not.
*419 As to the damages, this woman bled quite a bit from the multiple cuts in her face, and evidently suffered shock and mental anguish as well as much pain and suffering. As stated, it necessitated 35 stitches to sew up the cuts about the face. In addition, Dr. Reiger, attending physician, testified that the deep lacerations on the face did very nicely but that the small superficial lacerations formed keloids, which he described as a tumorous growth which occurs after an injury, predominately in the colored race. The wound healed with an exuberance of tissue and formed an elevated tumor or growth rather than healing as normal skin usually does. These keloids can be removed surgically but it usually results in a recurrence in the surgical incision. In other words, there is very little that this plaintiff can do to restore her normal looks. She testified that her appearance is embarrassing to such an extent that she has refrained from some of her social activities.
Counsel for defendant argued on the trial of the case in the Lower Court that any judgment the plaintiff should secure against the defendant should be offset by the $1,000 she received from the insurance company which was the insurer of Sholes' car. This argument is not sound in view of the fact that the insurance company's payment was made specifically as a result of a contract which did not include any payment of the defendant's damages to the plaintiff. It also had to be based upon the assumption that the plaintiff was negligent which we have found is not borne out by this record.
As to the amount of damage, considering the poor financial condition of the defendant and for that reason only, we will award the plaintiff $2,000 plus medical expenses shown by the record to be due Dr. Reiger in the amount of $84 with no allowance for the $10 charged for the written report furnished counsel for plaintiff, plus $62 to the optometrist, Dr. C. J. Gillian, making a total of $2,146. The award would be much higher if the defendant's financial condition was different.
It is therefore ordered that the judgment of the District Court be reversed and that there be judgment in favor of the plaintiff, Kate Evans Johnson, and against the defendant, Emmitt Whitfield, in the full sum of $2,146 with legal interest from judicial demand and all costs of this suit.