148 So.2d 371 (1962)
Callstro GARCIA et al., Appellants and Appellees,
v.
ANCHOR CASUALTY COMPANY et al., Appellants.
MID-STATES INSURANCE CO., Plaintiff-Appellee,
v.
ANCHOR CASUALTY COMPANY et al., Defendant-Appellant.
Nos. 5670, 5671.
Court of Appeal of Louisiana, First Circuit.
December 14, 1962.
Rehearing Denied January 18, 1963.
Certiorari Granted March 12, 1963.
Certiorari Denied March 12, 1963.
*372 Christovich & Kearney by W. K. Christovich, New Orleans, Ted J. Borowski, Houma, for appellants.
O'Neal & Waitz by Joseph L. Waitz, Houma, for appellees.
Before ELLIS, LOTTINGER, HERGET, LANDRY, and REID, JJ.
Certiorari Granted in No. 5670 March 12, 1963.
Certiorari Denied in No. 5671 March 12, 1963.
ELLIS, Judge.
On the afternoon of September 5, 1959 the plaintiff, Calistro Garcia, and his wife, Mrs. Esther Arrendo Garcia, visited their daughter, Mrs. Norman Lirette, who lived approximately 16 miles south of Houma, Louisiana, on the east side of Louisiana Highway No. 56 and parked their automobile facing south on the east side of the highway in front of the daughter's home, with the front to the south.
Between 5:30 and 6:00 P.M., the plaintiffs had completed their visit with their daughter and decided to go home. As their home was north on Highway 56, Mr. Garcia, rather than turn around, decided to back across the highway and into a driveway on the west side and then drive forward across the southbound traffic lane and into the north bound traffic lane to Houma, Louisiana. The driveway on the opposite or west side of the highway which Mr. Garcia intended to use was located approximately 49 feet diagonally to the northwest or should he back north on the shoulder along the north bound traffic lane, the distance to a point opposite the driveway on the west side was shown to be 46 feet and then west across the highway 18 feet to the shoulder. The manner and method of Mr. Garcia's backing maneuver will be discussed hereinafter. Mr. Garcia backed across the highway and had gotten his rear wheels off of the pavement onto the shoulder with half or slightly more of his car (about 8 feet) protruding into the south bound traffic lane when he was struck by an Oldsmobile belonging to the defendant, Sebastian, and being driven by the defendant, Claude L. Charpentier. Sebastian and Mrs. Dorothy Daigle were in the car being driven by Charpentier at the time of the accident. The Sebastian automobile was insured by the Anchor Casualty Company and the Garcia automobile was insured by the Mid-States Insurance Company. As a result of the collision, the plaintiffs suffered personal injuries and property damage for which they filed the present suit against the Anchor Casualty Company, Sebastian, the owner of the Oldsmobile, and Charpentier, the driver.
Mid-States Insurance Company had a policy of collision insurance covering the vehicle of Calistro Garcia, which was a total loss and its cash value at the time of the accident was $400.00. The Mid-States Insurance Company paid $375.00 to Garcia and was able to collect $145.00 as salvage, which left a balance of $230.00, for which Mid-States filed suit against Anchor Casualty Company, Sebastian and Charpentier. This case was consolidated for trial with Calistro Garcia et al. v. Anchor Casualty Company et al.
The suit of Calistro Garcia and his wife, Mrs. Esther Garcia, was filed on January 8, 1960, and on May 26, 1960, which was prior to the trial,[1] Calistro Garcia died and his succession was duly opened and Mrs. Esther Garcia was duly appointed and confirmed as administratrix of his succession, *373 and as such was duly substituted as party plaintiff for the deceased, Calistro Garcia.
Grounds of negligence alleged by plaintiffs against the defendant are as follows:
"1. Failing to maintain a proper lookout.
"2. Driving at a highly excessive rate of speed.
"3. Driving while intoxicated.
"4. Failing to see what he should have seen.
"5. Failing to make any attempt to avoid your petitioner's vehicle.
"6. Failing to apply his brakes or sound any warning to your petitioner.
"7. Generally driving in a reckless, negligent and careless manner."
And particularly the plaintiffs alleged in Article 17 that:
"Your petitioners aver that the defendant, Claude L. Charpentier, actually discovered or was in a position where he should have discovered your petitioner's peril and that at the time said peril was or should have been discovered, the defendant, Claude L. Charpentier, could have, with the exercise of reasonable care, avoided said accident in that he should have stopped his vehicle or passed around plaintiffs vehicle because there were no cars coming from the opposite direction."
The defendants deny the specific allegations of negligence made by the plaintiffs and plead the negligence of Calistro Garcia as a proximate cause of the accident and in the alternative set forth that Calistro Garcia was guilty of contributory negligence in the following respects:
"(1) Failing to stop his vehicle to allow the Sebastian vehicle to pass.
"(2) Failing to keep his car under proper control.
"(3) Failing to see what he should have seen.
"(4) Failing to yield the right of way to the Sebastian vehicle traveling on Louisiana Highway 56, thusly violating existing statutes.
"(5) In driving in a careless and reckless manner."
Further in the alternative the defendants charge that Mrs. Esther Garcia was guilty of contributory negligence in the following respects:
"(1) In failing to maintain a proper lookout.
"(2) In failing to warn her husband that he was not maintaining a proper lookout.
"(3) In distracting her husband while he was driving the said vehicle.
"(4) In failing to warn her husband of the presence of an approaching vehicle that she saw or should have seen coming down the highway."
The cases were duly tried and judgment was rendered in favor of Mrs. Calistro Garcia, as administratrix of the succession of Calistro Garcia and against Joseph Sebastian in the full sum of $10,000.00 and the policy limit of Anchor Casualty Company which was $10,000.00 was recognized and prorated and in accordance therewith the lower court rendered judgment against Anchor Casualty Company and John Sebastian in the full sum of $5841.69. Judgment was also rendered in favor of Mrs. Esther Arrendo Garcia in her capacity as administratrix and against Joseph Sebastian jointly and in solido in the full sum of $4158.31 for medical bills and related items of damage incurred by the wife with the liability of Anchor Casualty Company limited to $2170.50, together with interest and costs.
Judgment was also rendered in favor of Mrs. Esther Garcia individually and against *374 the defendants, Anchor Casualty Company and Joseph Sebastian in the full sum of $15,000.00 with legal interest thereon from date of judicial demand until paid, for personal injuries to Mrs. Garcia, with the liability of Anchor Casualty Company to be limited to the sum of $7829.50 with interest and costs.
It has been proven by a preponderance of the evidence in this record that prior to the date of the accident Sebastian and Charpentier had been employed on a fishing boat out of Morgan City and that during the Forenoon of the date of the accident the boat had come to Morgan City and docked, Sebastian and Charpentier, after cleaning up, went to a bar room where they met Mrs. Daigle, the mother of nine children, and her father who were enjoying some beers, as well as the Shrimp Festival which was in progress at the time in Morgan City. After drinking for awhile they invited Mrs. Daigle to go to Charpentier's home below Houma, Louisiana, and, over the objection of her father, she got in Sebastian's car with Charpentier driving and the trio left Morgan City. Sebastian and Mrs. Daigle denied that they had stopped prior to the accident for any drinking, however, it is definitely established that after they got to Houma they did stop at several places and also that after the accident two whiskey bottles were found in the car, one empty and one with a small amount of whiskey still in it. There is no doubt that all three were under the influence of intoxicants and Charpentier was described as drunk by witnesses who saw him in Houma and after he left the city of Houma to go to his home south of Houma, and also at the scene of the accident. Furthermore, the manner in which he was driving the automobile showed a reckless disregard for the safety of others as he deliberately bumped a bus several times which was preceding him in or near the city of Houma on Highway 56. In addition, Charpentier would drive slowly behind the bus, then pass it at 60 or 70 miles per hour and he repeated this performance several times. Approximately one mile north of the scene of the accident a witness, who was on the highway and intended to make a left turn in order to go to his home, saw the motor vehicle driven by Charpentier and occupied by Sebastian and the woman passenger approaching him in a "waving or weaving maneuver" so that he decided to pull off on the right hand side of the highway and allow them to pass before making his turn. He positively identified Charpentier as the driver as he was well acquainted with him and Sebastian, and estimated the speed of the automobile at approximately 70 miles per hour. He also saw Charpentier soon after the accident at the scene and described his condition as "drunk". In addition, it was established that at the moment of impact the Garcia vehicle was struck in the middle of the left side by the front of the Sebastian automobile and the point of impact was about the center of the south bound traffic lane. The Garcia motor vehicle was also sitting at right angles to the highway and therefore was occupying at least eight of the nine feet of the south bound lane of traffic. There were no skid marks made by the Sebastian automobile and the three eye witnesses positively testified that it did not slow down or blow its horn. Another important fact is that the highway is straight and there is no obstruction to the visibility whatsoever for a distance of half a mile north of the scene of the accident.
The speed limit on the highway at the scene of the accident was also established at 50 miles per hour.
While we are convinced that Charpentier was driving under the influence of intoxicants at the time of the accident, this is not to be construed as evidence per se, that his condition was the proximate cause of the accident, nor did it satisfy the burden of proof that he was guilty of any negligence which contributed to or brought about the accident.
In the case of McAllister v. Travelers Insurance Company, 121 So.2d 283, 286, *375 decided by this Court, with Judge Landry as the organ of the Court stated:
"In Bourg v. Aetna Casualty and Surety Company, La.App., 77 So.2d 131, 136, plaintiff sued to recover for personal injuries sustained when an automobile in which plaintiff was riding struck a bridge abutment on the left side of the highway. We note in the Bourg case, supra, the following appropriate comments:
"* * * There are several stages of drunkenness or intoxication. We find the following in Vol. 13, Words and Phrases, Drunk, Page 420:
"`A man is said to be "dead drunk" when he is perfectly unconscious powerless. He is said to be "stupidly drunk" when a kind of stupor comes over him. He is said to be "staggering drunk" when he staggers in walking. He is said to be "foolishly drunk" when he acts the fool. All these are cases of drunkenness, of different degrees of drunkenness. So it is a very common thing to say a man is "badly intoxicated," and again that he is "slightly intoxicated." There are degrees of drunkenness and therefore many persons may say that a man was not intoxicated because he could walk straight; he could in and out of a wagon. Whenever a man is under the influence of liquor so as not to be entirely himself, he is intoxicated; although he can walk straight. Although he may attend to his business, and may not give any outward and visible signs to the casual observer that he is drunk, yet if he is under the influence of liquor so as not to be himself, so as to be excited from it, and not to possess that clearness of intellect and control of himself that he otherwise would have, he is intoxicated.' * * *"
"We fully agree with learned counsel for plaintiff that inebriation per se may not be considered the proximate cause of every accident in which an intoxicated driver may become involved. We can readily conceive of numerous circumstances under which a drunken driver might become involved in an accident the cause of which is totally unrelated to the fact that the driver was operating his vehicle while under the influence of intoxicants. Whether or not intoxication is a contributing or proximate cause of any accident is purely a question of fact to be determined after full consideration of all the circumstances of each individual case."
An important fact established in this case as to the extent of Charpentier's intoxication and his ability to drive was shown by the testimony of Ray Boudreaux, the state trooper, called as a witness on behalf of defendants. After the trooper was placed on the stand, it was agreed that his report would become his testimony and it was so introduced. This report shows under the heading of "what drivers were doing" at the time of the accident that vehicle number 1, which belonged to Sebastian and was driven by Charpentier, was going straight ahead whereas vehicle number 2, which belonged to and was being driven by Calistro Garcia, was backing and under "Driver Violations Indicated" vehicle number 2 (Garcia) did not have the right of way and vehicle number 1 (Sebastian driven by Charpentier) is checked under "No. 23. No improper driving indicated," on the report. The report also shows that the highway was straight, built of concrete and that the accident happened in daylight, the weather was clear and no defects in the road. Under the heading, "Condition of drivers and pedestrian" with instructions written on the report to check one or more for each driver and pedestrian, we find both drivers as checked with "no apparent defects". Under the same heading, sub-head 1 "had not been drinking" we find the driver of vehicle number 2, who was Calistro Garcia, checked. Driver Number 1 is not checked; however, under sub-head 2 "had been drinking. If so: (d) not known *376 whether impaired" that driver number 1 Charpentier is checked. Therefore, under the stipulation it would be the testimony of the trooper who investigated the accident and the drivers that Charpentier had been drinking but that he did not know whether his ability to drive had been impaired. The report also shows that the trooper obtained a statement from Charpentier in which the latter told him that he was traveling south on Louisiana Highway 56 when he saw vehicle number 2 (Garcia) directly in front of him and he collided with the vehicle before he could apply his brakes. He also obtained a statement from Calistro Garcia, the owner and driver of vehicle number 2, and the report shows that Garcia told him that "he was parked on the shoulder of Louisiana 56 and started to back across Louisiana 56 to turn in a driveway when he was hit by vehicle number 1. Subject stated that he never saw vehicle number 1."
It is, therefore, necessary for this court to examine and consider all of the facts and circumstances shown by the record as occurring shortly prior to the actual impact in order to determine whether Charpentier's intoxication was a contributing or proximate cause of the accident, whether Calistro Garcia was guilty of negligence barring recovery by the administratrix of his succession, and whether Mrs. Esther Garcia was contributorily negligent so as to bar her recovery and, in any event, whether Charpentier as the driver of the Sebastian automobile had the last clear chance to avoid the accident.
It is shown that Calistro Garcia intended to back his automobile across the highway into the driveway of a Mr. Chauvin which was located to the north and on the opposite or west side of Highway 56. He did back his car across the highway so that at the moment of impact there were approximately eight or eight and one-half feet of the front end of the car still on the paved highway within the nine foot wide southbound traffic lane and an equal number of feet composing the rear end of the car on the shoulder. Evidently, Garcia was still backing and in the position just described when his car was struck at right angles by the front end of the Sebastian car being driven by Charpentier. There were no skid marks and Charpentier's statement to the trooper is fully corroborative of the fact that he did not apply his brakes prior to the impact as "he was traveling south on La. 56 when he saw veh. # 2 directly in front of him and he collided with veh. # 2 before he could apply his brakes." The trooper's diagram shows that the Garcia automobile was turned with its front end facing south from the force of the blow by the Sebastian vehicle when it ended up a distance of 60 feet from the point of impact and the Sebastian vehicle was 50 feet from the point of impact and still in its proper southbound lane of travel with the exception that the left front portion was over the center line in the northbound traffic lane.
There were three eye witnesses sitting on the porch of the Chauvin home, viz., Mr. and Mrs. Aaron Theriot and Mr. Chauvin. Mr. Chauvin did not testify and his failure to do so is not explained nor mentioned by either the plaintiff or the defendant. Aaron Theriot testified that the Garcia automobile was facing south on the opposite side of the road in front of their daughter's home, and when asked what happened answered: "They backed in front of this oncoming car across the highway, across the center line, into this driveway and that's when the impact occurred." He amplified this statement by further testifying that the front portion of the automobile was still upon the paved southbound lane of travel with the rear on the shoulder and driveway at the moment of impact; that he had been driving for approximately 23 years and estimated the speed of the Charpentier car as "over 60" and the backing speed of Garcia as "under 5"; however, the estimate of the backing speed for the purpose of estimating distances and time was stated in argument as approximately 5 miles per hour. Theriot stated that he saw the Charpentier car when it was approximately 250 feet from the point *377 of impact and that the Garcia car was about in the same position as at the time of the impact, half in the southbound traffic lane and the rear half on the shoulder and in the driveway. Under cross examination, this witness testified and re-testified that he saw the Garcias when they got in the car and that Mr. Garcia got in the car and went approximately 100 feet south and then backed up; however, he is clearly mistaken in this as it definitely established by a preponderance of the evidence that Calistro Garcia backed from his parked position in front of his daughter's house in a northerly direction. Theriot also stated that although he noticed the Charpentier driven car 250 feet from the point of impact that the actual impact occurred within a split second. The course followed by Garcia in backing across the highway proper is most important in arriving at the location of the Charpentier driven automobile at the time Garcia actually entered the highway in his backing maneuver. This witness testified that when Mr. Garcia had reached the end of the hundred feet that he drove south along the highway, that he then backed directly across the highway and counsel under cross examination made the statement under the guise of question to this witness, "By that I mean he turned his wheel as he started and went straight across the highway." To this the witness answered "Right."
Mrs. Theriot testified that she was sitting on the porch and she saw the Garcias back across the highway. However, she does not describe the course followed by the car in its backing maneuver and that at the moment of impact the back wheels were off "the paved road" but "I can't say for sure about the two front wheels, because I really wasn't watching. I didn't expect an accident, but I know the back wheels were off the road." She saw the Charpentier driven automobile "maybe 15 feet" before it struck the Garcia car and she estimated the speed of the former as being over 45 miles per hour, although she admitted she had never driven an automobile, in fact, admitted "I can't tell you just how fast it was going, but he was going, in my opinion he was going pretty fast." Both Mr. and Mrs. Theriot frankly admitted that they were not on friendly terms nor did they have any use for Charpentier due to marital difficulties the latter had with his wife and their opinion of his treatment of his wife who was related to Mrs. Theriot. The Court believes, however, that any mistakes which they might have made in their testimony were honest ones and not deliberate in any respect.
Mrs. Esther Garcia, plaintiff herein, testified that when they were ready to leave they told their daughter good bye, got in the car and "We looked both sides of the road. We didn't see nobody coming;" that her husband started backing out the car from the side of "my daughter's fence to Mr. Chauvin's driveway. Then he started to back up;" that when they were about half way across the road she looked to her left and told her husband that the car was coming and "He said yes, we have time to make it, so I keep looking on the other side and almost finished to tell my husband when the car hit us." She placed their car half in the driveway and half on the "pave" at the time it was struck. Mrs. Garcia testified positively that at the time she looked and saw the Charpentier driven car their automobile was in the middle of the road which we would interpret as meaning the front half was in the northbound traffic lane and the rear half in the southbound traffic lane which would fix the distance back from that point at the time to the point of impact at approximately 7 or 8 feet. She also testified that from the time they were in the middle of the road and she saw the car approaching from the north that she did not know how much time it took before the impact, "but it was quick. It was almost the same time I told my husband. It was so quick I don't know how much." She estimated the speed of the automobile as high as 85 miles an hour. However, when pressed on cross examination if it was going 80, 70, 60, 55, she finally answered "I don't know. I wasn't in his car." Under *378 cross examination, Mrs. Garcia was asked:
"Q. When did he tell you then this business about if the man had been going at a normal rate of speed he would have had time to make it?
"A. After I got home. After 7 weeks. We started to talk, and I told him I told you the car is coming. He said, yes, but I know I'm going to make it, because I have plenty of time to make it if the car had come normal."
Mrs. Garcia's testimony is in conflict with the statement which she gave an adjuster prior to the trial but which she denied that she had told him when questioned on the trial. However, in this statement, she is supposed to have said: "When the back of our car was partly in the driveway and the front wheels on the highway in the east bound lane I saw Sebastian's car which I later learned was going to hit us when it was about 12 feet west of us. I started screaming. The car hit us just about the time I saw it. I saw the car coming fast but how fast I don't know as it hit us about the time I saw it. My husband said he didn't see nothing. All he knew was I said watch the car." Be that as it may, we find no testimony in this record to the effect that Calistro Garcia ever saw the Sebastian automobile approaching from the north except the testimony of Mrs. Garcia that she warned him when they were in the middle of the road and the impact is bound to have occurred within one second thereafter. He could not have thought at that time that he had time to get out of the road.
We next come to the route or course followed by Calistro Garcia in his backing maneuver. The Garcias' daughter, Mrs. Norman Lirette, testified that a few days after the wreck and shortly prior to the trial she and her brother measured the distance from their gate where the Garcia car was parked to a point even with the driveway and that it was about 46 feet. She made it very positive that she measured from the gate along the eastern side of the highway to a point even or opposite the Chauvin driveway. From that point it was 18 feet across the paved portion of the highway to the shoulder on the west side. Why she measured it in that manner is unexplained by the record. Why she did not measure it diagonally from the gate to the driveway is unexplained for she was never asked such a question. However, Mrs. Garcia testified specifically on this point as follows:
"Q. Now then on this particular occasion your husband's car was parked on the shoulder by the gate in front of your daughter's house?
"A. Yes, sir.
"Q. And you both got in the car?
"A. Yes, sir.
"Q. Then what did your husband do. Right then when he started the motor what did he do?
"A. He started look to see if anybody was coming. If they don't have no cars coming he started backing out the car the side of the road and where he get in front of that driveway he started across the road."
We believe that this statement should and can only be interpreted to mean that her husband backed the car along the side of the road and when he got in front of Chauvin's driveway he started to cross the road. This would also evidently explain why the daughter and son measured the backing distance along the east side of the road to a point opposite the driveway.
There is no testimony at all that the Garcia car backed immediately into the highway from in front of the daughter's gate and in a diagonal route or course to the northwest toward the Chauvin driveway, which would have been approximately 49 feet. The course which was measured by the daughter and son and described by Mrs. Garcia was 46 feet plus approximately 10 feet to the position of the front end of *379 the car at the moment of impact or an overall distance of approximately 56 feet and accepting the backing speed of 5 miles an hour which is 7.3 feet per second, the Garcia car would have consumed slightly more than 6 seconds in backing the 46 feet and less than 1½ seconds to back the remaining 10 feet to the position in which it was at the moment of impact. If we should fix the speed of the Charpentier driven automobile at 70 miles per hour, (although the highest competent estimate was over 60) at the time the Garcias got in their car and started to move the 46 feet along the road the former was approximately 6 seconds distant to the north or about 615 feet. This road was straight, visibility was good and there was no obstruction and at this time if the Garcias had looked they would have seen this automobile at that distance. Had they seen this car some 600 feet away after backing for approximately 6 seconds and 46 feet, we do not believe that they would have backed into the highway. If we are correct in our interpretation of the testimony that they backed 46 feet before they actually started the back end of their car into the highway, the Charpentier driven automobile was approximately 1½ seconds from the point of impact and would then have been approximately 153 feet therefrom. Under the facts, we are of the firm opinion that Calistro Garcia was guilty of acts constituting gross negligence in backing his car from the shoulder into the main highway when he should and could have clearly observed the Sebastian car being driven by Charpentier approaching a comparatively short distance to the north. Such negligence constituted the direct and proximate cause of this accident.
The law governing cases of this kind has been covered and settled many times in our jurisprudence and recently in the case of Josey v. Granite State Fire Insurance Co., La.App., 122 So.2d 303, as follows:
"* * * An unusual degree of care is required of motorists who drive vehicles from a private driveway into a highway, and this requirement is increased when the vehicle is being backed into the highway. The appropriate statutory provision is found in LSA-R.S. 32:237, Subd. E, which reads:
"`[t]he driver of a vehicle entering a public highway from a private road * * * shall yield the right of way to all vehicles approaching on the public highway * * *'.
"The requirement of extreme care is set forth in numerous decisions of our courts, among which we note Dipino v. Joe Gulino & Son, La.App., 154 So. 772; Honeycutt v. Carver, La.App., 25 So.2d 99; Strehle v. Giaise, La.App., 46 So.2d 685; Turner v. Southern Farm Bureau Casualty Insurance Co., La. App., 91 So.2d 436; Johnson v. Whitfield, La.App., 89 So.2d 413; Gutierrez v. Columbia Casualty Co., La.App., 100 So.2d 537."
The petition of the plaintiffs specifically charged that the driver of the Sebastian automobile had the last clear chance to avoid the collision and if proven Mr. Garcia could still recover. However, under the facts in this case, Charpentier even if sober and traveling at the same rate of speed, had the right to assume the Garcia automobile would not back across the highway. Until it actually began such a maneuver which could or should have been seen by him, he could not be charged with any negligence. Thus, when Garcia was backing safely along the shoulder on the east side of the highway for a distance of 46 feet, Charpentier was under no duty to assume that he was ever going to back across the highway and it was only when Garcia actually started his backing maneuver into the highway that Charpentier was legally charged with notice and should have taken action to avoid the accident if possible. At the time that Garcia actually started to back into the highway, the Sebastian car was within 1½ or 2 seconds, *380 and a distance of 150 to 200 feet, from the point of impact, and had it been traveling at 50 miles per hour, the legal speed limit, it would have been impossible for the vehicle to have been stopped or any action taken to avoid the impact. Under the facts, Garcia was solely responsible for creating an emergency by backing into the highway and because of the shortness of time and distance, Charpentier, either sober or intoxicated, could not have avoided the collision.
The judgment of the Lower Court in favor of Mrs. Esther Garcia as administratrix of her husband's succession must be reversed and the suit dismissed.
Under the facts, we do not find that Mrs. Esther Garcia was negligent in any duty as a guest passenger. The question still to be decided is whether there was any negligence upon the part of Charpentier in the operation of the Sebastian automobile which contributed to the accident and injury to Mrs. Garcia.
From the facts in this case, which have been discussed in detail and the conclusions based thereon, we must answer this question in the negative. We do not find that Charpentier was guilty of any contributory negligence which was a proximate or contributing cause of the accident and injuries to Mrs. Garcia, but, on the contrary, that the gross negligence of her husband was the sole and proximate cause of the accident and injuries to himself and Mrs. Garcia and the property damage to his automobile.
For the above and foregoing reasons, the judgment of the District Court is hereby reversed and the suit of the plaintiff, Mrs. Esther Garcia, as administratrix of the succession of Calistro Garcia and against Anchor Casualty Company and Joseph Sebastian is reversed, annulled and set aside and the suit dismissed at the cost of the succession. The judgment of the District Court in favor of Mrs. Esther Garcia individually and against the Anchor Casualty Company and Joseph Sebastian is also reversed, annulled and set aside and her suit dismissed at her cost.
Reversed.
NOTES
[1] It is stipulated that his death was not related to or connected with any injuries he received in the accident.