SARTAIN, Judge.
This is one of three cases arising out of an accident which occurred on February 19, 1964 on U. S. Highway 190, two-tenths of a mile east of Livonia, Parish of Pointe Coupee, Louisiana. The determination of liability on the part of the defendants in each of these cases involves the same facts and circumstances. The companion cases are Fontenot et al. v. T. L. James & Co., Inc. et al., and Fontenot v. Hardware Mutual Casualty Company, 192 So.2d 805, decided this date.
This action was instituted by Mrs. Leona Fontenot Darbonne for personal injuries sustained while riding as a guest passenger in an automobile owned and operated by Emery J. Fontenot. Her husband, Leza Fontenot seeks recovery for special damages growing out of the same accident. The collision occurred between the Fontenot automobile, insured by Hardware Mutual Casualty Company, hereinafter called Hardware Mutual, and a tandem dump-truck owned by T. L. James & Co., insured by Firemen’s Fund Insurance Company, hereinafter called Firemen’s Fund, and driven at the time by Chester E. Brady, an employee of T. L. James & Co., Inc., acting within the course and scope of his said employment. Judgment is sought against both insurance companies in solido. The trial judge rendered judgment in favor of Mrs. Darbonne in the amount of $4,000.00 and in *809 favor of Mr. Darbonne in the amount of $1,129.84, and against Firemen’s Fund, T. L. James & Co., Inc., and Chester E. Brady and dismissed the suit against Hardware Mutual. Oral or written reasons were not given.
This appeal was taken by Firemen’s Fund urging two errors by the trial judge, the discharge of Hardware Mutual of any liability and the alleged excessiveness of the damages awarded to Mrs. Darbonne. Mrs. Darbonne answered the appeal asking that the damages awarded to her be increased and that Hardware Mutual be held liable jointly.
Highway 190 where this accident occurred runs in a generally easterly-westerly direction and consists of four lanes, two for each direction of traffic, separated by a small median. The collision occurred in the middle of the inside lane for east bound traffic. The Fontenot automobile was traveling towards Baton Rouge in an easterly direction on the inside lane. The truck insured by defendant Firemen’s Fund was backing across the eastern lanes of traffic. The rear of the truck collided with and shattered the right edge of the windshield and right windows of the Fonte-not automobile.
At the time of the accident which was in the early afternoon, T. L. James & Co., Inc. was repairing a portion of the inside lane for west bound traffic. They were in the process of removing the old pavement, and sand was to be dumped in its place, apparently preparatory to adding new concrete. Traffic from the direction of Baton Rouge was being routed on the outside lane for west bound traffic. Brady, driver of the truck, had picked up a load of sand from a place nearer Baton Rouge. When he reached the construction site, he found no place to park and therefore continued westerly towards Opelousas and finding a place to turn near Livonia he did so and returned back east to the construction site. He then parked his truck facing east on the south shoulder of the road. The plan was for him to back his truck across both lanes of east bound traffic and deposit the sand in the hole where the concrete had been removed. He had remained so parked for a period of IS to 20 minutes before he commenced his backing maneuver.
Riding with Mr. Fontenot was his wife, who was seated in the right front. Mrs. Darbonne was in the rear seat behind the driver and Mr. Bert Fontenot occupied the right-rear seat.
There are two versions to the accident. One comes from three of the defendant’s, Firemen’s Fund, witnesses and the other from Mrs. Darbonne and her witnesses. Brady, the driver of the truck, departed the community sometime following the accident and was not available to either side.
Defendant’s, Firemen’s Fund, version was related primarily by James M. Lewis, construction foreman for T. L. James & Co., Inc. He testified that when he was ready for the sand, he walked across the east bound lanes. After permitting some traffic in those lanes to pass, he stopped a car pulling a small trailer in the outside lane for east bound traffic. This car and trailer remained halted in the said outside lane some 30 to SO feet west of the truck. Observing no other east bound traffic, he motioned or called to the truck driver to commence backing, turning the rear of the truck to the north and across the east bound lanes, so that the back of the truck would be over the spot where the sand was to be deposited. At a time when the Fontenot automobile was approximately even with the car and trailer, Mr. Lewis hollered to the truck driver who immediately applied his brakes. The rear of the truck, which was then approximately in the center of the inside east bound lane, collided with the right side of the Fontenot automobile. Throughout the backing maneuver, Lewis was standing near and to the west of the truck.
Defendant’s Firemen’s Fund, witness William Billings testified that he looked up upon hearing the collision. He was oper *810 ating a gradall machine in the inside west bound lane at the time. He identified the car previously stopped by Mr. Lewis as pulling a small cargo or luggage trailer.
. The other witness called by Firemen’s Fund was Woodrow Broussard who was also working in the inside west bound lane. He identified the car previously stopped by Mr. Lewis as a red Corvair pulling a medium sized U-Haul trailer. He further stated that at the moment of the collision, the rear wheels of the truck were on the center line of the east bound lanes and that the collision occurred after the Fontenot vehicle had passed the Corvair by about 55 feet. He stated that the truck was across the east hound lanes “on a 45 degree”. The identity of the driver of the Corvair was never ascertained.
Mr. Fontenot testified that he was driving in the inside lane for east bound traffic and the truck was parked on the shoulder of the road. He stated that his first observation of the truck was when he was 15 to 25 feet from it and the truck was backing into his lane of traffic. He further testified that he attempted to apply his brakes but that he was too close to the truck and that he turned to his left as far as he could but that he was “squeezed between the center-divider” and the truck.
The testimony of the plaintiff, Mrs. Dar-bonne, and her witnesses Mrs. Lena Fonte-not, and Mr. Bert Fontenot can best be shown by quoting the same. Mrs. Fontenot testified: (Tr. 100)
“Q In your own words, would you tell the Court what you saw that morning?
A Well, we was going to Baton Rouge to visit my father in the hospital, and when we got a few miles from Baton Rouge, they had a truck going on the side of the road, and some construction going on the other side of the road. When I first saw the truck, I called my husband’s attention to it.
Q How far away were you when you first saw the truck beside the road?
A A block, maybe a block and a half.
Q And you say you called your husband’s attention to it ? What did you tell him?
A I told him to be careful, that they had a truck parked on the side of the road.
Q Where was this truck?
A Part on the shoulder of the road, and the road, in an angle.
Q At an angle. Do you mean a right-v angle to the highway?
A Going — well, yes, sir.
Q In which direction was the truck facing ?
A South.
Q And his back would then, of course, . , be north?
A Yes, sir.
Q Because the highway runs east and west at that point?
A Yes, sir.
Q Had he entered the roadway at the time you saw him?
A (No answer)
Q Had he gone on to the paved portion when you first saw him ?
A No, the truck was parked at the time I saw him.”
Bert Fontenot described the occurrence of the collision as follows: (Tr. 164)
“Q Well, sir I think you could start from the time you were 10 or 15 miles from Opelousas, somewhere in there.
A Well, we passed Krotz Springs and we was driving easterly towards Baton Rouge, and it was a nice day, *811 the sun was out, it was windy and it was cold, and we had the windows up. As I recall, I saw the truck about the length of a football field or less from where the accident happened. It was parked facing a southerly direction and I didn’t see anybody around the truck, and therefore I wasn’t too much concerned, because I didn’t think anything was going to happen. As we were passing by the truck, that is when the truck hit us, that’s the time I noticed the truck.
Q When you were about the length of a football field away from the truck, did you see any — was the truck stopped or was it moving at that time?
A The truck was stopped, sir.
Q Where was the truck stopped, sir?
A It was on the shoulder of the road facing in a southerly direction; the road running parallel this way, and the truck was in that direction (indicating) with the nose of the truck headed south.
BY MR. LEONARD : Indicating right-angles to the road for the record.
Q When you first saw this truck, did you see anybody around the truck?
A No, sir, I didn’t see anybody around the truck.”
Plaintiff, Mrs. Darbonne, testified: (Tr. IS)
“Q ' Where were you looking as you were driving — as you were riding down the road before the accident happened ?
A I was in back of Mr. Fontenot in the back seat.
Q Where were you looking?
A In the front.
Q Did you see the truck before it struck your car?
A Yes, sir.
Q When did you first notice it?
A When we was close to it is when I saw it, and then I saw the man,
Q When you first noticed the truck, where was the truck ?
A He was on the shoulder of the road parked.
Q Was he in motion, or was he stopped ?
A He was stopped.
Q What direction was the truck headed, if you recall?
A The side of the car, the right side.
Q I don’t think you understood my question. At the time you first saw the truck, what direction was the truck headed when it was on the shoulder ?
A He was cross-ways.
Q Where was that man located when you first saw the truck ? '
A On the side of the truck.
Q You say when you first saw the truck how far were you all away from the truck?
A About a block.
Q And at that time it was stopped?
A That’s right.”
Firemen’s Fund pleads the doctrine of last clear chance contending that Mr. Fontenot should have seen the truck and therefore would have had ample time in which to stop his car and avoid the accident. Alternatively, they plead that in the event the doctrine of last clear chance is inapplicable then Mr. Fontenot should be deemed contributorily negligent and his insurer, Hardware Mutual, be held jointly and in *812 solido for damages. The trial judge rejected both of these contentions and in our opinion correctly so.
From the above quoted evidence three occupants of the Fontenot automobile observed the truck. It was partly on the south shoulder and the outside lane for east bound traffic. When first observed hy them it was not moving and they attached no alarming significance to it. The •.testimony corroborates that of Mr. Fonte-not in that the truck commenced backing at a time Mr. Fontenot could do nothing to avoid the accident. Plaintiff’s witnesses placed the speed of the Fontenot automobile between 40 to 45 miles per hour and even defendants’ witnesses do not dispute this.
Mr. Lewis admitted that prior to the backing of the truck and before he stopped the Corvair and trailer, “There was quite a bit of traffic coming * * * ”. He remained within close proximity of the truck and after stopping the Corvair he made no further effort to ascertain if there was other east bound traffic. As a matter of fact he was primarily concerned with directing the truck and had his back to east bound traffic.
It would be conjecture on our part to hold that Mr. Fontenot should have seen anything other than that which was observed by the passengers in his automobile. And assuming arguendo that .Mr. Fontenot did in fact see what the other occupants of his automobile admittedly saw, he was entitled to expect that the truck would remain in a safe position and would not back across his lane of traffic. The evidence clearly shows that the truck did not commence its backing maneuver until Mr. Fontenot was abreast of the Corvair ■ and trailer some 55 feet at most from the point of collision and at a time Mr. Fontenot was . unable to avoid the accident. The sole and proximate cause of this accident was the backing of a tandem dump-truck across two lanes of traffic of a very busy major highway without proper signals or safeguards. Garcia v. Anchor Casualty Co., La.App., 148 So.2d 371; Foster v. Fidelity Mutual Insurance Co., La.App., 118 So.2d 139.
Appellant, Firemen’s Fund, further argues that the sum of $4,000.00 awarded to Mrs. Darbqnne is excessive. While it might appear that the injury sustained by her was insignificant, the consequences were troublesome, painful and persistent for a period in excess of a year following the accident. She initially received some glass in her left eye which healed routinely. She also sustained a small puncture wound of the lower left leg and it is this latter injury that constituted the basis of her award. Some glass particles became lodged in her leg and the wound would not heal properly. On three occasions the wound was probed for glass, March 16, 1964, April 3, 1964 and April 10, 1964. The probing procedure on this last date took 45 minutes and was unsuccessful. On May 18, 1964, the wound was still infected and was cauterized to permit draining. On March 28, 1964, she underwent an operative procedure in the doctor’s office under local anesthesia. The incision required four to six stitches. Finally, on March 9, 1965, she was admitted to the Opelousas General Hospital and underwent surgery on March 10, 1965 for the same injury. She remained in the hospital until March 22, 1965. Under these circumstances we do not believe that the trial judge abused his discretion in assessing damages in the sum of $4,000.00.
For the reasons above the judgment appealed from is affirmed. Defendants, Firemen’s Fund Insurance Company, T. L. James & Co., Inc., and Chester E. Brady are cast for costs.
Affirmed.